UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| IN RE: | ) |
| | ) Chapter 11 |
| THOMAS M. GRABANSKI and | ) |
| MARI K. GRABANSKI, | ) Bankruptcy No. 10-30902 |
| | ) |
| Debtors. | ) |

## RULING ON DISGORGEMENT AND SANCTIONS

These matters came before the Court for hearing in Fargo, North Dakota on a number of filings related to the compensation of Debtors' counsel Attorney DeWayne Johnston and Johnston Law Office P.C.[1] Sean Foss appeared for Interested Parties John and Dawn Keeley ("the Keeleys"). David Thompson appeared for DeWayne Johnson and Johnston Law Office P.C. ("Johnston"). After hearing arguments, the Court took these matters under advisement. The parties did not offer evidence or testimony at the hearing. The parties relied entirely on the lengthy record already developed on these issues. The parties filed post-hearing briefs. This is a core proceeding under 11 U.S.C. § 157(b)(2).

## STATEMENT OF THE CASE

Johnston received compensation for his work in connection with this bankruptcy beyond what the Court approved as reasonable. The Keeleys argue

---

[1] The Honorable Thad J. Collins, Chief United States Bankruptcy Judge for the Northern District of Iowa, sitting by designation.

that Johnston received $262,301.50 (or possibly $567,801.50 depending on treatment of a $300,000 payment) even though the Court approved only $37,013.76. The Keeleys ask the Court to order Johnston to disgorge the difference between what he received and what was approved—$262,301.50 or possibly $526,787.74.

Johnston argues that the Court cannot order him to disgorge fees related to this case. He argues: that the Court does not have jurisdiction over his fees because the Court dismissed the bankruptcy; that the Keeleys do not have standing to request disgorgement; that res judicata and the Rooker-Feldman doctrine preclude disgorgement; and that fees paid to him beyond the Court-approved amount were not for work done "in connection with" this case. He argues that, even if the Court could order disgorgement, he has already returned much of the money at issue through settlements and other litigation. The Court rejects Johnston's legal arguments, finds that his disputed fees were paid in connection with this case, that his fees exceeded the reasonable amount previously approved, and that he failed to properly disclose and explain the fees. The Court orders him to disgorge $44,887.74 in fees.

## BACKGROUND AND FACTS

This case has a long and complicated history. The Court has previously outlined the history of this bankruptcy in its April 12, 2013, Memorandum and

2

Order dismissing the bankruptcy.  See Doc. 572 at 2–24.  This history contained

many examples of Debtors' delays and misrepresentations to the Court and

creditors.  See id.  The Court noted that it had "bent over backwards to give

Debtors every possible benefit of the doubt" during the bankruptcy.  Id. at 31.  The

Court concluded that Debtors had "made no realistic effort to confirm a plan of

reorganization," "failed to provide accurate bankruptcy schedules upon which

parties could rely," and "willfully failed to abide by orders of the Court and to

appear before the Court in proper prosecution of their case."  Id. at 30–31.  The

Court dismissed the bankruptcy with prejudice.[2]  Id. at 32.

Since that time, the disputes in the case have been almost entirely about

Johnston's compensation for his work representing Debtors during the bankruptcy.

Specifically, the parties have disputed whether Johnston properly disclosed all the

compensation he received and whether he was entitled to that compensation.  What

follows is a detailed review of the dispute over Johnston's compensation.

In general, throughout these proceedings, the Keeleys, and other creditors,

sought disclosures from Johnston about his compensation.  They eventually sought

disgorgement of compensation based on evidence that he received compensation

related to the bankruptcy that the Court had not approved.

---

[2] Debtors would later file bankruptcy in the Eastern District of Texas—Bankruptcy
No. 13-41818.

3

For his part, Johnston maintained that he received compensation in connection with this case only if the Court approved it.  He has argued that fees paid to him from Debtors' wholly owned entities for work for those entities was not "in connection with" this bankruptcy and concludes that those fall outside his disclosure duties in this Court.  The Court has repeatedly rejected that argument. He asserted that any mistakes were innocent and that he acted in good faith.

The Court has already issued three opinions related to Johnston's fees.  The Court issued the first two of those opinions on the same day.  In re Grabanski, Bankr. No. 10-30902, 2013 WL 1702416 (Bankr. D.N.D. Apr. 19, 2013) (Order on Final Application for Compensation); In re Grabanski, Bankr. No. 10-30902, 2013 WL 1702415 (Bankr. D.N.D. Apr. 19, 2013) (Order on Motion to Show Cause).

In its Order on Final Application for Compensation, the Court addressed Johnston's final fee application, which requested $43,845.41 in fees and expenses. In re Grabanski, 2013 WL 1702416, at *3.  The Court noted that it had previously awarded Johnston $34,013.67 in fees, but had completely denied two later interim applications for $23,853.62 and $41,651.41 because there had been no progress in the case during the time covered by those interim applications.  Id. at *2–3.

In ruling on Johnston's final fee application, the Court outlined the troubled history of the bankruptcy and said, "[I]t is hard to find much or any of the services or expenses contained in Attorney Johnston's Application for Final Compensation

4

aimed at reorganization." Id. at *9.  The Court concluded that Johnston was

entitled to only $3,000 in addition to his initial interim award—for a final and total

fee award of $37,013.76.  Id.

In its Order on Motion to Show Cause, the Court addressed the Keeleys'

Motion for Order to Show Cause and For Contempt.  In re Grabanski, 2013 WL

1702415.  That Motion was based on evidence that Johnston failed to disclose all

the compensation he received for work in connection with the bankruptcy.  Id. at

*1–3.  The evidence at that time showed that, despite having previously disclosed

only $15,000,[3] "Johnston . . . received at least $205,400 from Debtors or

partnerships that are entirely owned by Debtors and/or under Debtors' control."

Id. at *3.  The Court said:

> Debtors' and Johnston's responses to all these requests for disclosure
> has basically been that the compensation approved to date is all the
> compensation he has gotten on this case.  He suggests that the other
> money coming to him—from entities related to or owned by the
> Grabanskis—[is] not relevant because those entities are not in
> bankruptcy.  This response has left great confusion about where a
> significant sum of money has gone.  The disclosure requirement is not
> limited to amounts the Court has approved.  The law requires disclosure
> of sums paid to an attorney representing a debtor "in connection with"
> a bankruptcy case.  11 U.S.C. § 329(a).  As noted above, this section is
> broadly interpreted in favor of disclosure.

---

[3] Notably, Johnston disclosed the $15,000 in compensation only after the Court
specially ordered Johnston to follow § 329 and disclose his compensation.  Doc.
375, entered December 14, 2011 (granting United States Trustee's Motion to
Compel Attorney to File Disclosure of Compensation Paid or Promised).

The disclosures Attorney Johnston has made and his explanations for why he has not disclosed other payments are inadequate and do not meet the requirements of the Bankruptcy Code. He has received payments "in connection" with Debtors' case and/or closely related entities and failed to disclose them. The disclosures Debtors have made—after being directed to do so by the Court—have left open more questions than they have answered.

Id. at *4 (paragraph omitted). The Court then specifically ordered Johnston:

to disclose all compensation, including monetary funds, property or other compensation, received from Debtors or related entities, including but not limited to G & K Farms, Texas Family Farms, MTM Farms, Grabanski Grain, LLC, the Keeley and Grabanski Land Partnership and any other entity in which Debtors have an interest, if such receipt was made after one year before the date of filing. The disclosure must include the date and amount of the payments and the payor of the compensation. It must also specifically address whether the compensation has been earned. If it has been earned, the disclosure must include the nature of the services provided and a description of the proceeding in which they were incurred, particularly in proceedings not held before this Court. If the compensation is unearned, the remaining balance of the compensation and the location where the compensation is currently being held must be disclosed.

Id. The Court denied the Keeleys' request for attorney's fees and sanctions at that time, but noted that the Keeleys' could renew those arguments and requests after Johnston made his full disclosure. Id. at *5.

On June 5, 2013, Johnston's filed his Disclosure of Compensation. Doc. 578. The Keeleys, joined by Choice Financial Group and PHI Financial Services ("Choice" and "PHI," respectively), creditors in the case, objected to Johnston's disclosure and Johnston responded to those objections. Docs. 590, 591, 593, 598 and 599. The Keeleys argued that Johnston's Disclosure of Compensation failed

6

entirely to comply with the Court's order. The Keeleys asked the Court to order Johnston to comply and to produce his billing and IOLTA trust account records. The Keeleys also sought disgorgement and payment of their attorney's fees.

On July 26, 2013, the Court held a hearing on the disclosure and objections and took the matter under advisement. The Keeleys filed a supplemental objection and Johnston replied. Docs. 603 and 605.

On October 27, 2014, the Court entered an Order addressing Johnston's disclosure of compensation. Doc. 608. The Order again detailed the case's history, relevant facts, and the parties' positions. Id. at 2–12. In the Order, the Court referred to Johnston's disclosure, doc. 578—as Johnston referred to it—"the Accounting." Id. at 4. The Court found, "The Accounting does not satisfy the requirements of the [Court's April 19, 2013 order requiring Johnston to disclose his compensation]." Id. at 15. The Court noted that the Accounting failed to clarify many important aspects of compensation disclosure—in particular, "whether larger lump sums were received, and if so, how many, and whether there is or was ever unearned compensation remaining in Johnston's IOLTA trust account"; "how lump sum payments were applied, particularly the $170,400 received on October 11, 2011"; "whether Johnston has separate trust accounts for Debtors and each of their related entities or whether legal fees for all are paid from one trust account"; and "whether there are funds in any of these trust accounts."

7

Id. at 15.  The Accounting also failed to provide detailed information about "who

made payments . . ., when those payments were made, the amount of those

payments, and how those payments were dissipated or held."  Id. at 15–16.  The

Court noted other deficiencies in the Accounting and discrepancies between the

Accounting and other documents Johnston filed.  Id. at 16–20.  The Court

concluded that, "[T]he Accounting does not comply with the Court's order entered

on April 19, 2013."  Id. at 20.

> The Court further noted:

> Throughout Debtors' case, Johnston has been evasive in making
> disclosures regarding compensation and has only done so after
> prompting by other parties and orders of the Court. Debtors' case was
> filed in July 2010, and Johnston has yet to file a full disclosure.  When
> he has made disclosures, the information contained in them, including
> the Accounting, has been speculative and caused concern for the Court.
> The disclosures have also been inconsistent.

> Additionally, Johnston continues to argue that compensation received
> from Debtors' related entities was not received "in connection with["]
> Debtors' case even though the Court rejected that argument in its
> previous order.  The Accounting failed to satisfy the Court's directives
> and has left the Court questioning how Johnston received
> compensation.

Id. at 20–21.

The Court did not order Johnston to disgorge fees at that time like the

Keeleys requested.  Id. at 21 ("The Court finds disgorgement of compensation and

payment of attorneys' fees is not warranted at this time—but will be considered if

8

full and satisfactory compliance is not forthcoming immediately.").  Instead, the Court found that "full disclosure of Johnston's billing records and his IOLTA trust account bank statements is appropriate now" and that such disclosure would "provide clarity on these issues." Id. at 21–22.  "This is the Johnston Law Firm's last chance to clarify the numerous issues that are discussed above.  The failure to comply will almost certainly result in Sanctions and Disgorgement." Id. at 24.

The Court ordered Johnston to file an amended accounting along with his billing records and IOLTA trust account statements. Id. at 24.  The Court ordered Johnston to file redacted IOLTA trust account statements with payments from Debtors and any of their related entities left unredacted. Id. at 24.  The Court also ordered the United States Trustee to file a response to Johnston's disclosure with "a statement of the United States Trustee's position on the sufficiency of the disclosure." Id.  The United States Trustee's office had taken a passive position on Johnston's compensation.

On November 11, 2014, Johnston filed his new Disclosure of Compensation, and supporting documents, including his IOLTA trust account statements.  Docs. 610, 611, and 612 ("Final Disclosure").  On December 23, 2014, the United States Trustee filed its response to Johnston's Final Disclosure, as ordered.  Doc. 613. The United States Trustee's response went through what it found to be the twelve issues that the Court had specifically addressed and required Johnston to answer

9

and clarify in its October 27, 2014 Order. Id. at 3–8. The United States Trustee analyzed whether the Final Disclosure met the requirements of the order. Id. The United States Trustee noted that Johnston violated 6 of his duties as counsel for the Debtors: "Counsel failed to accurately disclose the amount and source of the compensation to be paid in connection with the bankruptcy case, as required by §329"; "Counsel failed to disclose his connections to related entities and monies received in his application for employment as required under § 327 and Bankruptcy Rule 2014"; "Counsel paid himself without first obtaining court approval as required by § 330"; "Counsel's disclosures filed with the Court are incomplete, inconsistent and contradictory"; "Counsel failed to segregate estate funds from funds provided by related entities and failed to disclose that third parties were contributing funds to pay for services provided to the bankruptcy estate"; and "The accounting contains unexplained gaps." Id. at 11–12. The United States Trustee recommended that the Court order counsel to "disgorge the fees paid by the estate" and "sanction counsel by awarding the objecting creditors' attorney's fees in this matter." Id. at 13.

Johnston filed an objection to the United States Trustee's response in which he sought to clarify certain issues. Doc. 622. The United States Trustee then filed a Second Response to Disclosure replying to Johnston's clarifications. Doc. 626. The United States Trustee recommended, based on Johnston's response, "that the

10

Court issue an order to show cause why it should not issue sanctions or disgorge the fees paid in the case." Id. at 13.

The Keeleys also filed a brief responding to Johnston's Final Disclosure in which they "reiterate[d] their request for disgorgement of all attorney fees received by attorney Johnston and Johnston Law Firm beyond the $34,013.76 previously approved by this Court." Doc. 625 at 15. The Keeleys also asked for "an award of attorney fees . . . for being the primary party pursuing this issue, having filed multiple motions and objections to draw out the true nature of the compensation received by Johnston." Id.

On February 26, 2015, the Court held a hearing on the Final Disclosure and ruled that it was still inadequate. Doc. 627. The next day, the Court entered an Order Setting Show Cause Hearing. Doc. 628. That order said, "At [the February 26, 2015] hearing, the Court determined that the Disclosure of Compensation was inadequate and/or raised serious questions about the Johnston Law Firm's compliance with the Bankruptcy Code." Id. The Court scheduled the show cause hearing for April 9, 2015. Id.

Johnston appealed the show cause order to the United States District Court for the District of North Dakota. Doc. 629. The District of North Dakota noted that the appeal involved an interlocutory order, and as such, Johnston needed leave

11

of the Court to appeal.  Id. at 1–2.  The District Court denied leave to appeal the

interlocutory order and remanded to this Court.  Id. at 3.

Johnston then filed a motion to vacate the order to show cause.  Doc. 641,

643.  Johnston argued that the Court did not have jurisdiction or authority to hold

the show cause hearing or order him to disgorge fees.  In particular, Johnston

argued: (1) "The Court is barred from reviewing the $170,400 SURE payment by

G&K Farms/TFF to Johnston Law by the Rooker-Feldman Doctrine"; (2) "The

Order to Show cause, as it stands, is in violation of Johnston Law's due process

rights as Johnston Law has not been given the necessary notice of specific

allegations against Johnston Law"; (3) "The Court cannot review all the payments

made to Johnston Law by the Grabanskis and their entities, as the majority of the

payments are barred by res judicata or are outside the Court's jurisdiction"; (4)

"Until the Court finds that all of the proceedings impacted the bankruptcy, the

Court lacks jurisdiction to review payments made to Johnston Law Office for

services provided outside this bankruptcy"; (5) "The Court is barred by res judciata

from reviewing the $170,000 SURE payment, as the issue has already been

adjucated in a state court proceeding involving PHI, Choice, and Johnston Law";

(6) "The Court cannot reconsider any alleged bankruptcy violations by Johnston

Law, as this Court issued a final order following the prior Order to Show Cause

denying disgorgement and fees for violations of the bankruptcy code"; (7) "The

Court cannot utilize Rules of Civil Procedure § 60(a) to amend its prior judgment";
and (8) "Creditors PHI, Choice Financial, the Texas Trustee, and the Keeleys do
not have standing to contest payments to Johnston Law as these parties do not have
a direct interest in disgorged funds." Id. passim. Johnston asked the Court to
vacate the order to show cause based on these arguments. Id. at 49.

On April 9, 2015, the Court held a hearing on the order to show cause and
Johnston's motion to vacate the order to show cause. Doc. 644. At that hearing,
the parties informed the Court that Johnston and the United States Trustee had
reached a settlement agreement with Johnston that called for Johnston to pay
$15,000 to the Debtors' new bankruptcy estate in Texas. Based on this new
information, the Court continued the show cause hearing indefinitely.

In the meantime, Johnston also entered into a settlement agreement with
Mark Weisbart, the Chapter 7 Trustee in Debtors' Texas bankruptcy. In re
Grabanski, Bankr. No. 13-41818, doc. 173 (Bankr. E.D. Tex. June 23, 2015).
Trustee Weisbart had brought an avoidance action against Johnston. Id. at 3.
Trustee Weisbart sought return of $23,350 in property that Debtors transferred to
Johnston after this Court dismissed Debtors' bankruptcy. Id. Johnston and the
Chapter 7 Trustee settled this action with the Trustee releasing the claims in
exchange for Johnston paying Trustee $30,000. Id. The Bankruptcy Court for the

13

Eastern District of Texas approved the settlement.  In re Grabanski, Bankr. No. 13-41818, doc. 177 (Bankr. E.D. Tex. July 20, 2015).

On September 28, 2015, this Court held a status conference on the show cause hearing.  At that hearing, the Court set a deadline for parties to respond to Johnston's motion to vacate the show cause hearing.

That same day, the Court entered an order approving the settlement between Johnston and the United States Trustee.  Doc 649.  Under that settlement, Johnston was to pay $15,000.00 to Debtors, care of the Chapter 7 Trustee in their previously filed and currently pending bankruptcy in the Eastern District of Texas.  Id. at 2. Under the terms of the settlement, that payment would "satisfy and exonerate Johnston Law Office, P.C., and/or attorney DeWayne Johnston of any further claim under 11 U.S.C. § 329 or Federal Bankruptcy Rule 2016 for a turnover of fees, or 'disgorgement' of fees, or for sanctions, by the UST."  Id. at 3.  On January 9, 2016, Johnston filed a notice of compliance, stating that he had made the $15,000 settlement payment.  Doc 662.

The Keeleys continued to pursue this matter after the settlement with the UST.  The Keeleys had previously filed their reply to Johnston's motion to vacate the order for show cause hearing.  Doc. 652.  In that reply, the Keeleys argued that they had standing to pursue disgorgement under 11 U.S.C. § 1109(b).  Id. at 2. The Keeleys also argued that they had a direct pecuniary interest in the funds

14

because they are being pursued on debts from their partnership with Debtors and, to the extent fees are disgorged and sent to the Grabanski's Texas bankruptcy estate, they are creditors in that bankruptcy.  Id. at 3–4.  The Keeleys continued to press for further action from the Court.

On October 23, 2015, the Court held a hearing on these matters.  At that hearing, the Court made the following comments to counsel for the Keeleys, with respect to the disclosure of compensation:

> [W]hen the U.S. Trustee is satisfied, I'm usually satisfied, and [if] you have some pretty good reasons to tell me why the U.S. Trustee being satisfied on the disclosure of compensation, as the watch dog over the whole thing, is not sufficient and we need to look at this a little more closely, then I'm open to that.

> But what I'm looking at here is, I think, your real objection is to Mr. Johnston having compensation out of this case to the extent that he thinks he wants compensation. . . . [So this is] really sort of better suited for having him file a final fee application and we take up whether he's entitled to the fees or not.

Doc. 671 at 10.  After hearing comments and arguments, the Court said:

>  I think the disclosure [of] compensation issue is largely taken care of from my perspective.  I don't want to make a big summary decision here with the exception of whether [the Keeleys] are entitled to fees for pushing it along. . . . .  But I'm very comfortable saying that we're going to vacate the order to show cause.  We're going to continue to have the disclosure of compensation issue before the court based largely on the need to resolve the fees.

Id. at 23–24.  Consistent with these comments, the Court vacated the order to show cause and ordered Johnston to file a final fee application.  Docs. 659 and 660.

15

On January 9, 2016, Johnston filed what was docketed as Reference Final Fee App at Docket No. 552 and Corresponding Order at Docket No. 580.  Doc. 661.  In that filing, Johnston references and incorporates his Application for Final Compensation and the Court's Memorandum and Order on Final Application for Compensation, in which the Court awarded Johnston $37,013.76 in compensation. Id.  Johnston purported to file this document to fulfil the Court's October 27, 2015 (Doc. 660) order that he submit an application for final compensation.  All told, this indicated that Johnston would seek no additional compensation.

While this was pending in this Court, PHI was pursing Johnston and Choice in North Dakota state court for about $170,400 in SURE payments that G&K had received and sent to Johnston.  PHI argued that the SURE payments were subject to its security interest and sought return of the $170,400 from Johnston as a fraudulent or avoidable transfer.  The trial court found:

> [T]he $24,225.37 transferred to [Merlyn] Grabanski[] . . . was a fraudulent transfer and PHI was entitled to recover that amount from Johnston. The court also found the $150,000 payment was fraudulent, but found G & K received reasonably equivalent value for the transfer. The court allowed Johnston to retain $35,000 of the remaining funds, which the court found equaled the value of legal services provided to G & K, but voided the remaining $115,000.  A judgment with interest totaling $167,203.24 was entered in favor of PHI.

PHI Fin. Servs., Inc. v. Johnston Law Office, P.C., 874 N.W.2d 910, 914, reh'g denied (Mar. 28, 2016).

The parties appealed.  On January 26, 2016, the North Dakota Supreme Court reversed the trial court on the $20,424.37 transfer, finding that Johnston was not liable because he was "merely the conduit for the transfer" to Merlyn Grabankski.  Id. at 917.  The North Dakota Supreme Court also reversed on the issue of prejudgment interest on the $115,000 SURE payment.  Id. at 921.

The North Dakota Supreme affirmed the trial court on the remaining issues, agreeing that $115,000 of the $150,000 SURE payment was subject to PHI's security interest but that Johnston could retain $35,000 for legal fees.  Id. at 920. On remand, the North Dakota district court entered an amended judgment in favor of PHI against Johnston in the principle amount of $115,000, plus interest.

On February 27, 2017, this Court held a hearing on all matters not yet fully adjudicated.  The notice for that hearing listed 17 docket entries related to the procedural history recounted above—including Johnston's disclosure of compensation, objections thereto, and Johnston's final fee application—as matters that the Court would consider and act on.  Doc. 667.  At their core, these filings raise issues about whether the Court should order Johnston to disgorge or turn over any additional money paid in fees to him, if so how much, and whether additional sanctions are warranted.  The Court had previously told the Keeleys they would need to provide compelling arguments for the Court to consider disgorgement further.  The Keeleys provided such arguments.

17

## ARGUMENTS

The Keeleys argue that, based on Johnston's Final Disclosure, he received $262,301.50 (and possibly $563,801.50) in fees or compensation for his representation of Debtors in their bankruptcy and other matters. The Keeleys point to eight payments in Johnston's disclosure to show that he received $262,301.50:

- $15,000 on July 15, 2015 as an initial retainer

- $20,000 on November 9, 2010 from Texas Family Farms

- $20,000 on May 9, 2011 from Merlyn Grabanski

- $150,000 on October 14, 2011 from G&K Farms' SURE refund

- $20,400 on November 3, 2011 from G&K Farms' SURE refund

- $8,167.04 on April 15, 2011 from Debtors

- $5,384.46 on November 9, 2011 from Debtors

- $23,350 on July 19, 2013 from Debtors in the form of certain property

The Keeleys further point out that Johnston's IOLTA trust account statements filed as part of the disclosure contain two additional unredacted deposits: one for $1,500 and one for $300,000. Under the Court's previous orders, Johnston was to file redacted IOLTA trust account statements, but leave payments he received from other related entities in connection with Johnston's work in Debtors' bankruptcy unredacted. The Keeleys argue that, because Johnston left the $1,500 and $300,000 deposits unredacted, he concedes that these payments were

18

for work in connection with the bankruptcy.  The Keeleys conclude that if the

$1,500 and $300,000 deposits are payments in connection with the bankruptcy,

then Johnston has received a total of $563,801.50 in compensation.

This Court has already ruled that $37,013.76 is the limit of Johnston's

allowable compensation.  The Keeleys conclude that Johnston received

$225,287.74 (and possibly $526,787.74) beyond that limit.  The Keeleys ask the

Court to order Johnston to disgorge or pay over this amount.  The Keeleys also ask

the Court for attorney's fees for pursuing this matter over several years.

Johnston does not dispute that he received the payments outlined above (he

does not address the $1,500 and $300,000 deposits).  Johnston primarily relies on

legal arguments that the Court cannot order disgorgement or return of the

payments he received as fees: that the Court does not have jurisdiction over the

bankruptcy because it dismissed the bankruptcy, that the Keeleys do not have

standing to seek disgorgement because they do not have a direct pecuniary interest,

that res judicata bars disgorgement because this Court has already addressed his

fees, and that res judicata and the Rooker-Feldman doctrine bar disgorgement of

the SURE payments because they have already been addressed in the North Dakota

State Court litigation.  See PHI Fin. Servs., Inc. v. Johnston Law Office, P.C., 874

N.W.2d 910 reh'g denied (Mar. 28, 2016).  Johnston concludes that the Court

cannot order him to disgorge the fees as a matter of law.

Johnston argues that, even if the Court could legally order some disgorgement of fees, he has already effectively turned over or returned most of the funds the Keeleys now seek. Johnston returned $180,400 through settlements and as a result of the North Dakota Supreme Court ruling and judgment. He returned the $15,000 retainer payment through his settlement agreement with the United States Trustee. He returned the $30,000 in value he received from Debtors through his settlement with Trustee Weisbart in Debtors' subsequent Texas bankruptcy.

The Keeleys find no merit in Johnston's legal arguments. They argue that the Court still has ancillary jurisdiction over Johnston's fees, that they have standing because they continue to be creditors in the Debtors' Texas bankruptcy, and that res judicata and the Rooker-Feldman doctrine do not apply to this case because—although the North Dakota rulings may address the underlying funds—they did not address Johnston's entitlement to those funds under bankruptcy law.

The Keeleys only partially address Johnston's arguments about the amount of fees that the Court can or should order disgorged. They do not address the effect of Johnston's' settlements with the United States Trustee and with Trustee Weisbart. They also do not address the North Dakota trial court's finding that Johnston transferred $20,424.37 from the $20,400 SURE payment to Merlyn Grabanski. They do admit, however, that the $115,000 North Dakota judgment in favor of PHI may reduce the proper disgorgement amount by $115,000.

20

## CONCLUSIONS OF LAW AND ANALYSIS

### I.    Legal Bars to Disgorgement and Fee Award

Johnston argues that Court does not have the authority to order him to

disgorge some or all of the fees.  Johnston argues that the Court does not have

jurisdiction to order disgorgement because the Court has dismissed the bankruptcy;

that the Keeleys do not have standing to request disgorgement or fees; that res

judicata bars disgorgement here; and that the Rooker-Feldman doctrine also bars

disgorgement here.  The Keeleys disagree on all points.  The Court will address

these arguments in turn.

### A. Jurisdiction

Johnston argues that the Court no longer has jurisdiction to order

disgorgement of any fees.  Johnston argues that the Court lost jurisdiction when it

dismissed the bankruptcy.  Johnston argues that, to have retained ancillary

jurisdiction over his fees, the Court needed to say so in the dismissal order.  For

support, Johnston cites Iannini v. Winnecour, 487 B.R. 434, 439 (W.D. Pa. 2012)

("Courts may determine the propriety of compensation in an underlying

bankruptcy case post-dismissal by explicitly retaining jurisdiction. . . . . where the

court does not explicitly retain such jurisdiction, the court thereafter presumptively

lacks jurisdiction over the issue.").  Johnston notes that the Keeleys initially sought

disgorgement before the Court dismissed the bankruptcy and that the Court did not

21

explicitly retain jurisdiction over the issue.  Johnston concludes that the Court lost

jurisdiction when it dismissed the case without expressly retaining jurisdiction.

The Keeleys disagree.  They argue that the Court still has "ancillary

jurisdiction" over the case, which includes jurisdiction over attorney's fees.  The

Keeleys cite In re Petrovic, 560 B.R. 312, 315 (Bankr. N.D. Ill. 2016) ("A

bankruptcy court . . . has ancillary jurisdiction to examine the fees of counsel for a

debtor under section 329 post-dismissal.").

The Court has already addressed this issue in a previous ruling in this case

and found that it continued to have post-dismissal jurisdiction over Johnston's fees:

> Despite the dismissal of a case, the Court continues to have jurisdiction
> over fee requests and compensation.  In re Garris, 496 B.R. 343, 354
> (Bankr. S.D.N.Y. 2013); In re Dixon, Bankr. No. 06-10988PM, 2007
> WL 1073862, at *1 (Bankr. D. Md. Feb. 9, 2007); In re Hughes, Bankr.
> No. 05-00488, 2006 WL 3019556, at *1 (Bankr. D.C. Oct. 20, 2006);
> In re Fox, 140 B.R. 761, 762 (Bankr. D.S.D. 1992).  "The Court has an
> independent duty to review and evaluate attorney compensation
> disclosure and requests, regardless of dismissal.["] In re Burroughs,
> Bankr. No. 12-81073-TRC, 2012 WL 5053054, at *3 (Bankr. E.D.
> Okla. Oct. 18, 2012).  "The allowance of fees is a core matter under 28
> U.S.C. § 1334(b).["]  In re Garris, 496 B.R. at 354 (citing In re Brown,
> 371 B.R. 486, 494 (Bankr. N.D. Okla. 2007)). The Brown court held
> that "[t]he Court's jurisdiction to review such fees is not dependent on
> whether the status of the case stands as open, closed, pending, or
> dismissed.' Id. (quoting In re Brown, 371 B.R. at 494) (alteration in
> original).
>
> This jurisdiction includes considerations made by the Court pursuant to
> § 329.  See In re Burroughs, 2012 WL 5053054, at *3; In re Dixon,
> 2007 WL 1073862, at *1; In re Hughes, 2006 WL 3019556, at *1; In re
> Henderson, 360 B.R. 477, 484 (Bankr. D.S.C. 2006). Section 329
> requires attorneys to disclose compensation paid for services rendered

in connection with a bankruptcy case. 11 U.S.C. § 329(a). There is no
timing requirement provided in § 329 with regard to when the
compensation is paid or when the services are rendered. Accordingly,
payments made after dismissal for services rendered in connection with
a bankruptcy case fall within the purview of § 329 and the Court's
jurisdiction.

Doc. 608 at 23–24. The Court relied on this conclusion when it ordered Johnston
to turn over his IOLTA trust account statements and billing records. Id. at 24. The
length of time since dismissal is irrelevant. The Court thus rejects Johnston's
argument that it no longer has jurisdiction to order disgorgement under § 329.

### B. Standing

Johnston next argues that the Keeleys, the only parties still pressing this
issue, do not have standing to seek disgorgement. Johnston argues that, in order to
have standing, the aggrieved party must demonstrate that it has a direct pecuniary
interest in the outcome of the proceeding. Johnston argues that the Keeleys have
made no such showing. Johnston concludes that the Keeleys do not have standing
to seek disgorgement.

The Keeleys disagree and note that they were creditors in this bankruptcy
and in the Grabanski's ongoing bankruptcy in Texas. The Keeleys argue that if the
Johnston disgorged fees go to the Debtors' Texas bankruptcy estate, the Keeleys
will receive a portion of any disbursement from the estate as creditors. The
Keeleys argue that this shows that they have a pecuniary interest in disgorgement.

23

Section 1109(b) provides:

> A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, **a creditor**, and equity security holder, or any indenture trustee **may raise and may appear and be heard on any issue in a case under this chapter**.

11 U.S.C. § 1109(b).  This section "is to be construed broadly, in order to allow parties affected by a chapter 11 case to appear and be heard."  In re Sandpoint Cattle Co., LLC, 556 B.R. 408, 417 (Bankr. D. Neb. 2016) (internal quotation marks omitted) (quoting In re Alpha Nat. Res. Inc., 544 B.R. 848, 854 (Bankr. E.D. Va. 2016)).

The Court finds that that the Keeleys were creditors in this bankruptcy and continue to be creditors in the Texas bankruptcy and thus have standing to seek disgorgement of Johnston's fees.  They have set out a pecuniary interest in the funds—if the disgorged fees go to the Debtors' Texas bankruptcy estate, the Keeleys will be able to take part in any distribution as creditors.  Moreover, even if they did not have standing, "the Court has an independent duty to review fee applications."  Id. at 417 (finding that the Court could address whether disgorgement was proper even if the creditor did not have standing).  Even if the Keeleys did not have standing, the Court may explore the issue sua sponte.

### C. North Dakota Supreme Court Ruling on SURE Payments

Johnston argues that, at a minimum, the Court cannot order him to disgorge the compensation he received in the form of the $20,400 and $150,000 SURE

24

payments because the North Dakota Supreme Court has already addressed these payments.  The North Dakota Supreme Court ruled that Johnston was a mere-conduit for the $20,400 SURE payment, which he simply transferred to Merlyn Grabanski, and that Johnston could retain $35,000 of the $150,000 SURE payment for his work representing G&K farms.  PHI Fin. Servs., Inc. v. Johnston Law Office, P.C., 874 N.W.2d 910, 914, 917, 920–21 reh'g denied (Mar. 28, 2016).  The Court awarded PHI Financial Services the remaining $115,000 of the SURE payment because of its security interest in the SURE payments.  Id. at 922.

Johnston argues that the principles of res judicata and the Rooker-Feldman doctrine now preclude the Court from addressing the SURE payments.  He asserts that the North Dakota Supreme Court has already fully addressed how the money should be treated.  In particular, he argues that the Keeleys are attempting to void the North Dakota Supreme Court's ruling that he was entitled to retain $35,000 of the $150,000 SURE payment for his working representing G&K Farms.

The Keeleys disagree.  The Keeleys do not dispute that the state court had jurisdiction over PHI's claims and entered a final judgment on those claims.  The Keeleys argue, however, that the state court action did not involve the same cause of action or the same parties.  The Keeleys note that they were not a party to the state court action and that the state court action did not address Johnston's entitlement to the funds under the Bankruptcy Code.  Similarly, the Keeleys argues

25

that the Rooker-Feldman doctrine does not apply because they were not parties to the state court action and are not attacking the state court judgment.

The Court will address these issues in turn—first res judicata, then the Rooker-Feldman doctrine.

### i. Res Judicata

"Under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." Finstad v. Beresford Bancorporation, Inc., 831 F.3d 1009, 1013 (8th Cir. 2016) (internal quotation marks omitted) (quoting Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984). "North Dakota long has defined res judicata as a 'doctrine that prohibits the relitigation of claims or issues that were raised or could have been raised in a prior action between the same parties or their privies and which was resolved by final judgment in a court of competent jurisdiction.'" In re Athens/Alpha Gas Corp., 715 F.3d 230, 235–36 (8th Cir. 2013) (quoting Hofsommer v. Hofsommer Excavating, Inc., 488 N.W.2d 380, 383 (N.D. 1992)).

The Supreme Court of North Dakota has adopted a four-element standard to determine whether res judicata applies:

> there must be (1) "[a] final decision on the merits in the first action by a court of competent jurisdiction," (2) "the same parties, or their privies," in the second action as in the first, (3) an issue in the second

26

action that was "actually litigated" or that "should have been litigated
in the first action," and (4) "[a]n identity of the causes of action."

Id. at 236 (quoting Missouri Breaks, LLC v. Burns, 791 N.W.2d 33 (N.D.2010)).

"Privity exists if a person is so identified in interest with another that he represents

the same legal right." Id. at 237 (quoting Simpson v. Chicago Pneumatic Tool Co.,

693 N.W.2d 612, 616 (N.D. 2005)).

Here, res judicata does not apply. The parties are not the same and the

issues are not the same. The Keeleys did not participate in the previous litigation

nor are they in privity with PHI. Although Johnston alleges that the Keeleys and

PHI are in privity, there is nothing in the record to support that allegation. PHI and

the Keeleys do not "represent the same legal right"—PHI pursued the SURE

payments in the North Dakota litigation based on its security interest, while the

Keeleys are pursing disgorgement of fees as creditors in Debtors' bankruptcy.

Moreover, the issue Johnston seeks to preclude here is not the same as the

issue in the North Dakota litigation. The North Dakota Supreme Court ruling

addressed the payments as fraudulent or voidable transfers. PHI Fin. Servs., Inc.,

874 N.W.2d 910 passim. Whether the transfers to Johnston were avoidable or

fraudulent is not the same issue as whether he received compensation beyond what

the Court approved as reasonable for his work in connection with the bankruptcy.

The North Dakota Supreme Court did not address Johnston's entitlement to fees as

Debtors' counsel. Only this Court has jurisdiction to decide the proper amount of

27

Johnston's compensation for his work under 11 U.S.C. § 329 and whether he has

exceeded the allowable amounts such that he must disgorge fees.

The North Dakota Supreme Court's ruling on whether PHI was entitled to

return of the SURE payments under North Dakota fraudulent transfer law does not

bar this Court from considering disgorgement of unreasonable compensation under

11 U.S.C. § 329 under the doctrine of res judicata.[4]

### ii. Rooker-Feldman

"As established by the Rooker–Feldman doctrine, federal district courts do

not possess subject matter jurisdiction over challenges to state court decisions."

Christ's Household of Faith v. Ramsey Cty., 618 F. Supp. 2d 1040, 1043 (D. Minn.

2009). "The basic theory of the Rooker–Feldman doctrine is that only the United

States Supreme Court has been given jurisdiction to review a state-court decision,

so federal district courts generally lack subject-matter jurisdiction over attempted

appeals from a state-court judgment." Friends of Lake View Sch. Dist.

Incorporation No. 25 of Phillips Cty. v. Beebe, 578 F.3d 753, 758 (8th Cir. 2009)

(internal quotation marks omitted). The Supreme Court said:

> The Rooker–Feldman doctrine . . . is confined to cases of the kind from
> which the doctrine acquired its name: cases brought by state-court
> losers complaining of injuries caused by state-court judgments rendered

---

[4] Although the North Dakota Supreme Court's ruling does not legally bar this Court
from addressing Johnston's compensation from the SURE payments, the rulings do
affect, as a practical matter, the amount of money that Johnston now retains as a
part of his compensation for work in connection with the case. See Part III.

28

before the district court proceedings commenced and inviting district
court review and rejection of those judgments.  Rooker–Feldman does
not otherwise override or supplant preclusion doctrine or augment the
circumscribed doctrines that allow federal courts to stay or dismiss
proceedings in deference to state-court actions.

Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).

"[A]fter Exxon Mobil there are four requirements for the application of the

Rooker–Feldman doctrine: (1) the federal court plaintiff must have lost in state

court, (2) the plaintiff must complain of injuries caused by a state court judgment,

(3) the plaintiff must invite district court review and rejection of that judgment, and

(4) the state court judgment must have been rendered before the district court

proceedings commenced."  Christ's Household of Faith, 618 F. Supp. 2d at 1044

(citing Skit Intern., Ltd. v. DAC Techs. of Arkansas, Inc., 487 F.3d 1154, 1156–57

(8th Cir. 2007)).

Here, the Keeleys were not a part of the North Dakota state litigation.  They

claim no injury from the North Dakota Supreme Court's ruling.  The Keeleys are

not asking the Court to review or reverse the North Dakota Supreme Court's

ruling.  That ruling addressed whether G&K's transfer of SURE payments to

Johnston were fraudulent transfers—not proper bankruptcy compensation.  Finally,

these bankruptcy fee proceedings commenced long before the state court

proceedings.  The Rooker-Feldman doctrine does not apply here.  This Court has

jurisdiction to order Johnston to disgorge compensation under § 329.

29

## II.    Disgorgement/Return of Payments

Bankruptcy Code § 329 provides:

(b) **Any attorney representing a debtor** in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, **shall file with the court a statement of the compensation paid** or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, **for services rendered** or to be rendered in contemplation of or **in connection with the case** by such attorney, **and the source of such compensation**.

(c) **If such compensation exceeds the reasonable value of any such services**, **the court may** cancel any such agreement, or **order the return of any such payment, to the extent excessive**, **to**—
    (1) **the estate**, if the property transferred—
        (A) would have been property of the estate; or
        (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; **or**
    (2) **the entity that made such payment**.

11 U.S.C. § 329.  The Eighth Circuit Bankruptcy Appellate Panel has said:

The test under § 329 measures reasonable value of the services provided by the attorney. To the extent that the fees due or paid are not reasonable in light of the services provided, the court may cancel the fee agreement or order disgorgement. The court, having determined fees to be unreasonable, may order the fees returned to the estate if the source of the paid fees would have been property of the estate and only to the extent that the fees are excessive.

Schroeder v. Rouse (In re Redding), 247 B.R. 474, 478 (B.A.P. 8th Cir. 2000).

Here, Johnston's disclosures reveal that he has received $262,301.50 (and

potentially $563,801.50) in compensation from entities wholly-owned by or

closely related to Debtors.  Johnston has argued throughout these proceedings,

however, that most of this compensation was paid for work that was not "in connection with the case" and thus did not need to be disclosed.  Johnston has asserted that these large fee payments were for non-bankruptcy work for separate entities that the Debtors owned.

The Court has already rejected this argument and found that he must disclose fees for work done for Debtors' wholly-owned entities as compensation "for services rendered . . . in connection with the case."  Doc. 608 at 20–21.  "The phrase 'in connection with' has been broadly interpreted to include any services that affect the bankruptcy estate."  Charity v. NC Fin. Sols. Of Utah, LLC (In re Charity), Bankr. No. 16-31974-KLP, Adv. No. 16-03121, 2017 WL 3580173, at *24 (Bankr. E.D. Va. Aug. 15, 2017) (collecting cases).  A recent case has laid out how the "in connection with" standard applies:

> To determine whether services are "in connection with" the bankruptcy case, courts apply an objective standard: "[I]f it can be objectively determined that the services rendered or to be rendered by the attorney have or will have an impact on the bankruptcy case," then such services . . . have been rendered in connection with the bankruptcy case.

> Attorney Durell argues most of the fees he received were categorically not for services "in connection with" a bankruptcy case, because the services he rendered would have occurred regardless of the Debtors' bankruptcy filing. This argument underestimates the broad application of the phrase "in connection with" and understates the extent to which the legal services he rendered, during the pendency of the bankruptcy case, were intertwined with the interests of the bankruptcy estate. All services Attorney Durell rendered after May 20, 2015 were in connection with the bankruptcy case since he was representing the Debtors while their bankruptcy case was pending. Furthermore, based

> on the record, it is indisputable that the so-called non-bankruptcy legal services were for litigation that was crucial to the Debtors' attempts to reorganize under Chapter 13 and cannot be disentangled from the bankruptcy legal work. Based on these considerations, the relevant case law, the extensive reach of the phrase "in connection with," and Attorney Durell's failure to establish facts to the contrary, the Court finds all fees paid to Attorney Durell from May 20th forward were for services rendered in connection with the bankruptcy case.

In re Frye, 570 B.R. 21, 29 (Bankr. D. Vt. 2017) (citations omitted).  The same

court also concluded that the source of the payments does not change the analysis:

> Attorney Durell argues fees paid by third parties are not subject to disclosure requirements. However, the language of § 329(a) provides otherwise. It requires a debtor's attorney to disclose the source of payments received, regardless of what that source is: An attorney representing a debtor . . . shall file with the court a statement of the compensation paid or agreed to be paid...for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, **and the source of such compensation**. The bankruptcy court may order the disgorgement of any payment made to an attorney representing the debtor in connection with a bankruptcy proceeding, irrespective of the payment's source.

Id. at 30–31 (citations omitted) (quotation marks omitted) (emphasis in original).

This reasoning applies here and the Court (again) rejects Johnston's

arguments that the disputed payments were not for work done "in connection with

the case."  Over the many years and multiple proceedings in the bankruptcy,

Johnston has provided no satisfactory explanation how and why his work for these

"separate entities"—companies wholly-owned by Debtors—was not "in

connection with" the case.  Johnston has never made any showing to meet these

standards or made any persuasive argument— despite having multiple

opportunities to do so—that the money he received over and above the $37,013.76 was not "for services rendered . . . in connection with" the case.  In fact, the record shows that the compensation at issue was most likely for work "in connection with the case."  Like counsel in Frye, Johnston "understates the extent to which the legal services he rendered, during the pendency of the bankruptcy case, were intertwined with the interests of the bankruptcy estate."  Id. at 29.  The Court gives this argument no further consideration.

Under the clear terms of § 329, "If such compensation exceeds the reasonable value of any such services, the court may . . . order the return of any such payment . . . ."  Thus, "To the extent that the fees due or paid are not reasonable in light of the services provided, the court may cancel the fee agreement or order disgorgement."  In re Redding, 247 B.R. at 478.

Here, Johnston received compensation in connection with the bankruptcy that exceeds the reasonable value of his services.  The Court has already determined that the reasonable value of Johnstons' services was $37,013.76.  In re Grabanski, 2013 WL 1702416, at *9 ("His compensation for Debtors' case is limited to $34,013.76 that the Court previously awarded . . . , with the additional $3,000 awarded here, for a total of 37,013.76.").  Johnston's disclosures reveal that he has received $262,301.50 (and potentially $563,801.50) in compensation for work done "in connection with" this case.  Thus, Johnston's compensation for

33

work done "in connection with the case" exceeds the reasonable value of his work

by at least $225,287.74.

Moreover, "It is well settled that disgorgement of fees is an appropriate

sanction for failure to comply with the disclosure requirements of section 329 and

Rule 2016." In re Sandpoint Cattle Co., LLC, 556 B.R. 408, 426 & n.10 (Bankr.

D. Neb. 2016) (The Honorable Shon Hasting, Chief United States Bankruptcy

Judge for the District of North Dakota, sitting by designation) (collecting cases).

"Filing incomplete or inaccurate disclosures also may be grounds for sanctions,

including disgorgement." Id. at 427. "The decision to reduce fees, deny fees or

order disgorgement of fees under section 329 is within the sound discretion of the

bankruptcy court." Id. at 426. "Many courts, perhaps the majority, punish

defective disclosure by denying all compensation." In re Kowalski, 402 B.R. 843,

848 (Bankr. N.D. Ill. 2009).

When an attorney violates the Bankruptcy Code and Rules in the Eighth

Circuit, however, Chief Judge Hastings has concluded that the Court **must** order

the attorney to disgorge excessive fees:

> Although bankruptcy courts may exercise discretion to award or deny
> fees for failure to disclose, they should deny them when an attorney
> fails to comply with the Bankruptcy Code and rules. The Eighth Circuit
> Court of Appeals has held that, where a debtor's attorney has failed to
> comply with the statute and the rules, subsequent fee applications
> **should** be denied and the funds received **should** be ordered returned to
> the estate. It is worthy of note that the Eighth Circuit used the word
> should and not the word may, thereby giving a strong indication that

34

disgorgement of the fees received is the expected and proper remedy to
be applied.

In re Sandpoint Cattle Co., LLC, 556 B.R. at 427 (internal quotation marks

omitted) (quoting In re Redding, 251 B.R. at 552–53).

Here, the Court has already found that Johnston's disclosures were

"inadequate and do not meet the requirements of the Bankruptcy Code."  In re

Grabanski, 2013 WL 1702416 at *4.  The Court repeats those findings here.

Johnston did not follow the Bankruptcy Code's disclosure requirements.  He

repeatedly failed to disclose completely and accurately his fees in connection with

the case.   He disclosed fees only after the Court specifically ordered him to do so.

And even after the Court expressly ordered him to disclose as the Code required,

his disclosures were incomplete, inaccurate, and confusing.

Under § 329 and Eighth Circuit caselaw, the Court must order Johnston to

disgorge fee payments he received that exceed the reasonable value of his work.

### III.    Disgorgement Amount

Johnston argues that, even if disgorgement is appropriate, $225,287.74 is not

the proper amount.  Johnston argues that his two settlements related to fees and the

North Dakota Supreme Court judgment already effectively returned some of the

disputed payments or show that he no longer possesses the disputed payments.

As stated in Section I, Johnston's disclosures reveal that he received

$262,301.50 (and potentially $563,801.50) in compensation related to this case.  In

35

particular, he received the following payments for services rendered in connection

with the case:

- $15,000.00 on July 15, 2015 as an initial retainer

- $20,000 on November 9, 2010 from Texas Family Farms

- $20,000 on May 9, 2011 from Merlyn Grabanski

- $150,000 on October 14, 2011 from G&K Farms' SURE refund

- $20,400 on November 3, 2011 from G&K Farms' SURE refund

- $8,167.04 on April 15, 2011 from Debtors

- $5,384.46 on November 9, 2011 from Debtors

- $23,350 on July 19, 2013 from Debtors in the form of certain property

Johnston argues that the following payments, however, can no longer be

considered part of his compensation in this case:

- $15,000 returned as a part of his settlement with the United States Trustee.
  Doc. 649.

- $20,400 SURE payment from G&K Farms, which the North Dakota state
  Court litigation determined that he sent to Merlyn Grabanski.  PHI Fin.
  Servs., Inc., 874 N.W.2d 910 at 914 ("Johnston transferred $24,225.37 from
  the Trust account to Merlyn Grabanski . . . .").

- $115,000 of the SURE payment from G&K farms, which the North Dakota
  Supreme Court determined was property of PHI, and entered judgment
  accordingly.  Id. at 921.  There is nothing in the record to indicate if he has
  paid this judgment.

- $30,000 returned as a part of his settlement with the Chapter 7 Trustee in the
  Grabanski's bankruptcy in the Eastern District of Texas.  In re Grabanski,
  Bankr. No. 13-41818, Docs. 173 and 177.

36

Johnston argues that these funds, which total $180,400, can no longer be included in the amounts that he received as compensation related to the bankruptcy.

The Keeleys do not address these arguments. They note only that the Court may reduce the disgorgement order by $115,000 given the North Dakota Supreme Court's ruling.

> It is well settled that a bankruptcy court may deny an attorney all compensation based upon the failure to satisfy § 329(a) and Rule 2016(b). Full disgorgement of fees is not automatic, and the bankruptcy court has the latitude to tailor a sanction that is appropriate under the unique circumstances of the case. In determining the appropriate type and amount of sanction, the court exercises its discretion and examines the particular facts of the case, including whether any unusual difficulties existed. Additionally, the sanction should be carefully tailored to be sufficient to punish the misconduct but no more than is reasonably necessary to deter the culpable conduct.

In re Frye, 570 B.R. at 31–32 (citations omitted) (internal quotation marks omitted) (alteration omitted).

Based on the record, the Court will reduce the amount that Johnston must disgorge by $180,400. Johnston was originally paid at least $262,301.50 by Debtors and entities related to Debtors. Through Johnston's' settlements, he has sent a total of $45,000 to the Grabanski's bankruptcy estate in their Texas bankruptcy. The North Dakota ruling found that he no longer has the $20,400 SURE payment because he sent it to Merlyn Grabanski. The North Dakota ruling

37

also found $115,000 SURE payment was subject to PHI security interest—as a result, Johnston now has paid or must pay that money to PHI.

Thus, Johnston currently has $81,901.50 in compensation remaining from his work in connection with this bankruptcy. After subtracting the $37,013.76 in compensation the Court approved as reasonable, he has still been overpaid—in amounts never properly explained—by at least $44,887.74. The Court thus orders Johnston to disgorge $44,887.74 and pay it to the Debtors' new bankruptcy estate.

The Keeleys have also identified two additional payments totaling $301,500 reflected on Johnston's IOLTA account statement that need to be addressed. These two payments are not redacted, and the Keeleys argue this indicates these payments may in fact be connected to Johnston's work in this case. The Court concludes that, if these payments were for work done in connection with the case, Johnston must also disgorge that money and pay it over to the Debtors' new bankruptcy estate. The Court will give Johnston the opportunity to explain the $301,000. Given Johnston's history of misleading and incomplete disclosures, the Court orders Johnston to file, within 30 days of this ruling, evidence showing the source of the $300,000 and $1,500 payments. Johnston must also report whether those payments were made in connection with the case as discussed above.

## IV.    Sanctions

"Courts have an 'inherent power . . . to levy sanctions in response to abusive litigation practices.'" Crooked Creek Corp. v. Primebank (In re Crooked Creek Corp.), 533 B.R. 274, 281 (Bankr. N.D. Iowa 2015) (quoting Roadway Exp., Inc. v. Piper, 447 U.S. 752, 765 (1980)).  "A court's inherent power to sanction is very powerful, and therefore must be used with restraint and discretion." Id. (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)).  "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Id. (internal quotation marks omitted) (quoting Chambers, 501 U.S. at 44).

The extensive history of the litigation on these issues case reflects Johnston's abusive litigation practices: delay, misrepresentation, and continued reliance on arguments that the Court has already rejected.  These practices— beyond the excessive fees and failure to disclose—resulted in prolonged litigation and increased cost.  This cost was born primarily by the Keeleys.  As the Court noted on the record in a prior hearing, when the United States Trustee is satisfied on a fee issue that is usually strong indication that no meritorious issues remain.  It turns out that that was not the case here.[5]  Without the work of Keeleys' counsel

---

[5] In reviewing the voluminous record in this case, the Court is reminded that the United States Trustee took an inexplicably passive approach to fees—participating only when ordered by the Court.

pursuing this matter, it is quite possible that Johnston would retain the disputed fees.  The Court finds that an appropriate sanction for Johnston's abusive litigation practices in this case is the amount of the Keeleys' reasonable attorney's fees for their work pursuing disgorgement.

## CONCLUSION

**WHEREFORE**, the Court orders Johnston to disgorge $44,887.74 in fees to the Chapter 7 Trustee in the Grabanski's bankruptcy in the Eastern District of Texas—Bankruptcy No. 13-41818.

**FURTHER**, the Court orders Johnston to file a disclosure showing the source of the unreacted $300,000 payment and $1,500 payments on this IOLTA trust account within 30 days of this ruling.

**FURTHER**, the Court sanctions Johnston in the amount of the Keeleys' reasonable attorney's fees for their work pursing disgorgement.  The Keeleys' have 21 days to file a formal fee application for fees and expenses incurred in the pursuit of disgorgement.

Dated: October 24, 2017

THAD J. COLLINS
U.S. BANKRUPTCY JUDGE
SITTING BY DESIGNATION